No. 80-82

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

_____

DONALD McSWEYN,

Plaintiff and Respondent,

vs.

MUSSELSHELL COUNTY, MONTANA, HOUGEN
LAND, INC., a Montana Corporation,

Defendants and Appellants.

_____

Appeal from:   District Court of the Fourteenth Judicial District,
               In and For the County of Musselshell
               Honorable Alfred B. Coate, Judge presiding.

Counsel of Record:

    For Appellant:

        John Pratt argued, County Attorney, Roundup, Montana
        Moulton, Bellingham, Longo & Mather, Billings, Montana
        Sidney Thomas argued, Billings, Montana

    For Respondent:

        Holmstrom, Dunaway and West, Billings, Montana
        Robert Holmstrom argued, Billings, Montana

_____

                        Submitted:  April 20, 1981

                         Decided:  August 10, 1981

Filed: AUG 10 1981

_Thomas J. Kearney_
_____
                        Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal by the defendants from a judgment of the District Court, Fourteenth Judicial District, Musselshell County, declaring certain oil and gas leases owned by the plaintiff, Donald McSweyn, to be valid. We reverse the judgment of the District Court.

Defendants raise these issues on appeal:

1. Were the provisions of a contract for deed between Musselshell County and A. D. Shields, containing a 2 1/2 percent mineral reservation, merged into a subsequent deed between those parties in which the County reserved a 2 1/2 percent royalty interest?

2. Is a quiet title decree entered prior to the execution and delivery of the deed from the County to Shields, res judicata as to the successors in interest and other parties in this case?

3. Did the deed in which the County reserved the royalty interest result in an unconstitutional gift to Shields?

4. Is McSweyn barred by estoppel, laches, or waiver from claiming that the County has a mineral interest rather than a royalty interest?

This case comes to us on an agreed statement of facts. The County through tax proceedings had acquired the real property described in the oil and gas leases to McSweyn with which we are concerned. In 1933 the County entered into a contract with Shields for the sale to Shields of the real property. The contract contained the following reservation:

> ". . . vendor [County] reserves to itself and its successors an undivided two and one-half percent of all oil, gas and other minerals lying in, under and beneath the premises hereinbefore described. . . ."

All parties agree that the above language created a mineral reservation.

-2-

Before full payment had been made and deed delivered under the 1933 contract for deed, Shields filed a quiet title action against the County and other defendants which resulted in a 1943 decree. The decree in part stated:

> ". . . A. D. Shields, is the owner, seized in fee and entitled to the possession of the following described real property . . . excepting and reserving to the said defendant Musselshell County, Montana, 2 1/2% of all oil, gas or other minerals lying in, under and beneath [the said land] . . ."

Approximately one year later, in 1944, the County executed and delivered to Shields a deed covering the property in question which contained the following reservation:

> ". . . and reserving unto . . . [the County] its successors and assigns, an undivided two and one-half percent royalty of all oil, gas, and other minerals lying in, and that may be produced from the premises hereinbefore described, delivered free of cost . . ."

The parties again agree that the foregoing deed language constitutes a royalty reservation as distinguished from the mineral reservation contained in the contract for deed.

After 1944 the lands described in the deed were transferred by Shields and his successors in interest to other parties. In 1974, 30 years after the deed, the successors in interest of Shields executed oil and gas leases to Exeter Company, which assigned its interest to Exeter Exploration Company, which in turn made partial assignments to True Oil Company. Oil wells were drilled on the lands in 1976 and four of the five wells drilled are presently producing oil.

In 1976, one day before drilling started on the first well, plaintiff, McSweyn, obtained from the County the first of his oil and gas leases covering the County's mineral interest in the lands. The second lease was obtained by McSweyn from the County 19 days later. The McSweyn leases, which are valid only if the County owned and retained a

mineral interest rather than a royalty interest, contained the following disclaimer:

> "The execution of this instrument shall in no way prejudice the right of Musselshell County to claim its interest is a royalty interest rather than a mineral interest."

McSweyn brought this action in 1977 asking the District Court to declare and determine his rights and interests under his oil and gas leases from the County. After the commencement of that action, the County entered into a written agreement with all of the real property owners, who are Shields' successors in interest, and other parties. The agreement covered the land involved in this action as well as other lands. The agreement points out that the County executed contracts for deed containing <u>mineral</u> reservations, not only covering the Shields land but also other County lands. All of such contracts for deed were followed by deeds containing <u>royalty</u> reservations similar in form to the deed to Shields. The agreement further stated:

> "The parties hereto are desirous of settling these differences and settling the County's interest in the above described property, and the parties hereto mutually agree that where the deeds from the County to the various Purchasers show that there was a 2 1/2% royalty, that said royalty interest be considered to be a 2% interest, and wherever the County reserved a 6 1/4% royalty in the above described property, that said interest be considered to be a 4% royalty interest. Furthermore, the County makes no claim to any mineral interest in the above described property, and makes claim to only royalty interest as set forth above."

The agreement further conveys to the County the 2 percent royalty interest in the land described in this case.

The District Court held that the contract for deed contained a reservation of mineral interest and the issuance of the deed at a later date gave Shields more than he had bargained for. The court found that a mineral interest is more valuable than a royalty interest and that the deed by the

County to Shields was an unconstitutional donation or gift by the County. The court further found that the 1943 judgment in the quiet title action cannot be attacked and that such decree commanded the County to issue a mineral interest deed which the County failed to do. The court further found that the 1943 decree is res judicata in this proceeding. The court found no element of estoppel or laches and held that the waiver argument fails in that it presupposes that the County could give away its mineral interest without compensation. The District Court found the McSweyn leases to be valid.

The law of oil and gas in Montana passed through periods of growth and change during the 1930's and 1940's. Judge Jameson refers to the statutory history in Superior Oil Co. v. Vanderhoof (1969), 307 F.Supp. 84. He points out that section 4481.2, R.C.M., 1935, described the reservation which a county could make during the 1930's. That code section is confusing. It refers to mineral right reservations and then uses terminology which is more consistent with royalty reservations. The statute was so confusing that it would have been difficult for any county official to determine the correct application. Superior Oil Co. points out that the code section was repealed by Chapter 171 of the session laws of 1941, which also provided that on sales of real property "the county may reserve not to exceed six and one quarter percent (6 1/4%) royalty interest in the oil, gas and minerals produced and saved from said land."

In this case, the 1933 contract between the County and Shields attempted to follow the old code section and contained a reservation of a 2 1/2 percent mineral interest. The 1943 decree quieting title contained the same reservation. That

quiet title decree is not particularly significant. It was brought by the then county attorney for Musselshell County. Our fact situation is similar to that described by Judge Jameson in <u>Superior</u> <u>Oil</u> <u>Co</u>.:

> "Nor is the decree quieting title particularly significant. It simply sets forth the reservation as it appeared in the deeds [in our case the contract for deed]. Obviously no issue was raised in that action as to whether the reservation was a mineral or royalty interest. As noted supra, apparently the county attorney represented the Vanderhoofs in the action. [This was also true as to Musselshell County and the county attorney.] No appearance was made by the county. . ." 307 F.Supp. 91.

Next in this case is the 1944 deed in which the County reserves an undivided 2 1/2 percent royalty interest. This is the first time the County directly participated after the 1933 contract. In 1944 the County was operating under the 1941 session laws. While there is no evidence in the agreed statement of facts, the statutory history gives an obvious explanation for the change in the provisions of the deed by the County. The deed was accepted by the grantee, Shields, and recorded. No question was raised by either party for more than 30 years.

### Merger By Deed

McSweyn requests that his oil and gas leases be found valid, and the District Court so determined. It is important that we keep in mind that this request has the effect of asking the court to reform the 1944 deed. We must, therefore, consider the rules regarding reformation of deeds and merger.

In substance McSweyn contends that the 1944 deed should be reformed because of the mutual mistake of the County and Shields. The elements for such reformation are set out in Voyta v. Clonts (1958), 134 Mont. 156, 328 P.2d 655, as follows:

"'A sequence statement of reformation is this: There is a prior understanding of the parties; the parties execute a written contract; somewhere and sometime between the understanding reached and the actual creation of the written instrument, a mistake occurs. It occurs in reducing to writing the agreement which the parties have intended. Obviously the alleged mistake must relate to something then in the contemplation of the parties. The fault sought to be corrected is that the executed written instrument does not reflect the actual and true understanding of the parties. This is a cardinal principle in the field of reformation for mutual mistake. Then, and only then, can the powers of equity be invoked to correct the mistake.'" (Emphasis added.) 134 Mont. 166, 328 P.2d 661.

McSweyn contends that the fault sought to be corrected is that the 1944 deed does not reflect the actual and true understanding of the parties as contained in the 1933 contract. However, as stated in Voyta, in order to reform the deed on the ground of mutual mistake, the evidence of mistake must be clear, convincing and satisfactory. The court in Voyta further states:

"'The presumption is that the writing contains the final agreement of the parties and expresses their real purpose and intent. To meet and overcome that presumption plaintiff was required to present clear, convincing and satisfactory proof. . . .'" 134 Mont. 167, 328 P.2d 661.

Other than the instruments, there is no evidence in the record concerning the intent of the County and Shields at the time of the 1944 deed. In addition there is absolutely no evidence of mutual mistake unless we should find that the instruments themselves show such mutual mistake.

As stated above, we begin with the presumption that the 1944 deed contained the final agreement of the County and Shields and expressed their real purpose and intent. The District Court found that the 1943 quiet title decree was res judicata as to the interests of the party and defined the County's reservation as a 2 1/2 percent mineral interest. Res judicata is discussed later in this opinion. While it

-7-

is true that the decree specified the interests of the parties in 1943, that does not prevent the parties from making a subsequent change in their respective interests. The 1944 deed shows that the County made a change in its reservation. As we pointed out in our brief history, the 1941 statute afforded a reasonable explanation for the change on the part of the County. The execution of a deed by the County in 1944 containing a royalty reservation does not on its face indicate mutual mistake as between the parties when compared to the 1933 contract for deed. As stated in Voyta:

> "'It cannot be said that the evidence in this case is either clear, convincing, or satisfactory, as to the alleged mistake. . .'" 134 Mont. 167, 328 P.2d 662.

In addition, the County and all other parties agreed in 1977 that the 1944 deed reserved a royalty. Not one of the interested parties are claiming mutual mistake. The only claim of mutual mistake is made by McSweyn, who seeks to apply a technical rule which directly contradicts the desires of the parties who own the mineral and royalty interests. Equitable principles do not allow this Court to reform the deed in direct disregard of the mutual understanding of all of the parties owning an interest in the property. Equity also requires that we consider the effect on the County. There are a number of operating wells on the land in question. If the County's interest is a royalty, the County will be entitled to receive 2 percent of production under its agreement with the balance of the parties. If the McSweyn contentions are upheld, the County will lose more than 80 percent of such 2 percent of production. The benefit of the difference flows primarily to McSweyn.

McSweyn has agreed that the execution of his leases with the County shall in no way prejudice the right of the County to claim its interest is a royalty interest rather than a mineral interest. The County does claim that its interest is a royalty interest. It would be inequitable to disregard this provision.

We find that the plaintiff has failed to overcome the presumption that the 1944 deed contains the final agreement between the parties and that the doctrine of merger does apply, so that the 1944 deed effectively reserved to the County the 2 1/2 percent royalty interest described in the deed.

Unconstitutional Gift

Although the issue had not been presented by either party, the District Court concluded that all things being equal, a mineral interest in real property is more valuable than a royalty interest. Reasoning from that position, the court concluded that the deed resulted in an unconstitutional gift or donation by the County to Shields.

Rist v. Toole County (1945), 117 Mont. 426, 159 P.2d 340, points out that the holder of a mineral interest has an interest in the land and has the right to go on the property, to explore and drill for oil and gas and the obligation to pay for a proportionate share of development costs. A holder of a royalty interest does not have the right to go on the property to explore for undeveloped oil and gas, but the royalty holder is not obligated to pay the costs of development. The holder of the royalty interest simply shares in the profit from production. The District Court apparently concluded that because the mineral interest holder has greater rights with respect to real property itself than the royalty interest holder, such a mineral

right has a greater value. There is nothing in the agreed statement of facts to show the comparative values of royalty and mineral interests in this particular land. The agreed statement of facts does show that the royalty interest which we find is owned by the County will have a much larger present share in production than would be true of a mineral interest. As a result, we conclude that the record does not show a 1944 gift, or the equivalent, by the County to Shields.

Quiet Title Decree As Res Judicata

The District Court held that the 1943 quiet title action which was completed prior to the issuance of the 1944 deed was res judicata as to the present action. The District Court relied on Smith v. County of Musselshell (1970), 155 Mont. 376, 472 P.2d 878. We do not find Smith to be authority for the position taken by the District Court. There are major differences between the Smith case and the present case.

In the Smith case, on June 4, 1941, Musselshell County (the same county as involved in the present case) entered into a contract for deed in which it reserved an undivided 6 1/4 percent of all oil, gas and other minerals lying in, under and beneath the premises. Next by deed dated April 5, 1944, the County conveyed the land by a deed in which it reserved an undivided 6 percent royalty of all oil, gas and other minerals lying in, and that may be produced from the premises hereinbefore described, delivered free of cost. In 1945, the buyer from the County brought an action to quiet title to the land, in which the County's reservation was decreed to be 6 1/4 percent of all oil, gas and other minerals lying in and that may be produced from the said premises.

-10-

The County attempted to argue that under the 1941 statute, the County could reserve only a 6 1/4 percent royalty interest and excluded the right of the County to reserve a mineral interest. In the Smith case this Court found that the 1945 decree was res judicata of the particular issues involved. The result is that in Smith the quiet title decree was the last conclusive statement concerning the interests of the parties, having been entered after the deed from the County. In contrast, in the present case, the quiet title action occurred before the deed was executed, delivered and accepted. Therefore, the quiet title is not res judicata of the interests of the parties here involved. See Brannon v. Lewis and Clark County (1963), 143 Mont. 200, 387 P.2d 706.

As previously discussed, the 1943 decree was not the result of litigation between Shields and the County. The County defaulted. The attorney for Shields was also the county attorney. Our fact situation is comparable to that in Superior Oil Co. Because the issues involved in the 1943 quiet title action are not of necessity the same issues in- volved in the 1944 deed, because the mineral interest question was not litigated in the quiet title action, and because the deed was executed, delivered and accepted the year following the issuance of the quiet title decree, the quiet title decree is not res judicata.

### Estoppel, Laches and Waiver

The agreed statement of facts suggests that there may be a proper basis for the application of the doctrines of estoppel, laches and waiver. However, in view of our opinion on the other issues, it is unnecessary for us to reach decisions on these theories.

We also note the approach of the Montana legislature to the question of long-standing conveyances and reservations

involving mineral and royalty interests. In "validation" statutes such as sections 16-1122 and 16-1122.1, R.C.M., 1947, the legislature confirmed and validated mineral and royalty reservations made by counties. While we do not find it necessary to determine if such validation sections are applicable in the present case, we take note that the legislature deemed it worthwhile to eradicate doubts as to long-standing conveyances and reservations, some of which may have contained provisions which are questionable under its own "uncertain or ambiguous" statutes.

We find that Musselshell County owned a 2 1/2 percent royalty interest in the lands involved in this case and not a mineral interest and conclude that the oil and gas leases from Musselshell County to McSweyn did not grant an effective lease upon a mineral interest. The judgment of the District Court is reversed, and the District Court is instructed to enter appropriate judgment in conformity with this opinion.

We concur:

_____

Gordon R. Bennett, D.J. Sitting for Chief Justice Frank Haswell

_____
Justices

Mr. Justice John C. Sheehy dissenting:

I disagree with the holding in this case.

The majority opinion goes against its own statement of facts. It translates a purported ambiguity in a statute authorizing counties to reserve oil and gas interests into a contract between the County and Shields in 1933 that is unambiguous as to a mineral reservation. To repeat the reservation in the 1933 contract:

> ". . . vendor [County] reserves to itself and its successors an undivided two and one-half percent of all oil, gas and other minerals lying in, under and beneath the premises hereinbefore described.. . ." (Emphasis added.)

As the majority sets out in its statement of facts "[all] parties agree that the above language created a mineral reservation."

The major force upon which the majority relies in changing an outright, plain mineral reservation into a royalty reservation is the holding in Superior Oil Co. v. Vanderhoof (1969), 307 F.Supp. 84. The majority relies upon Superior Oil Co. due to inadequate legal research into that case, and the majority hopes, perhaps, to tilt the legal balance in favor of their opinion by associating the name of Judge Jameson in their behalf. (This method is called "tilt-by-association".) The trouble is the majority did not read Judge Jameson far enough as to what Superior Oil Co. held, nor look at the applicable statutes.

There was no contract for deed shown in the Superior Oil Co. case. The decision turns upon the language in a deed from Richland County to a transferee, in which the following reservation was set out:

-13-

"Further reserving unto said grantor
[County] six and one-fourth (6 1/4%)
percent of all minerals contained in and
hereafter mined, produced, extracted or
otherwise taken from the above described
property."  307 F.Supp. at 85.

The quiet title action in the Superior Oil Co. case

resulted in a decree recognizing the following interest:

"All of the above described property being
subject to a reservation in and to Richland
County, Montana, of six and one-fourth (6 1/4%)
percent of all minerals contained in, mined,
produced, extracted or otherwise taken from
said lands;. . ."  307 F.Supp. at 85.

Contrast, if you will, the language contained in the

deed and quiet title decree in the Superior Oil Co. case

with the language contained in the 1933 contract for deed

above quoted, and also with the language in the quiet title

decree in this case which stated:

". . . A. D. Shields, is the owner, seized
in fee and entitled to the possession of the
following described real property . . . [lands
described] excepting and reserving to the said
defendant Musselshell County, Montana, 2 1/2%
of all oil, gas or other minerals lying in, under
and beneath [the described land] . . ."

". . . That the defendants . . . have no right,
title or interest whatsoever in said premises
. . . save and except the reservation of the
mineral rights to the said Musselshell County,
Montana . . .

". . . That upon the payment of the said balance
by the plaintiff, the said defendant, Musselshell
County, Montana execute and deliver a deed to the
plaintiff, conveying the entire legal title, as well
as the equitable title to the said lands, and that
the defendant, Musselshell County, Montana be
thereafter perpetually enjoined from any manner
interfering with the plaintiff's title to or possession
of the said premises or any part thereof except
as to the reservation of oil, gas and other minerals
hereinbefore set forth."  (Emphasis added.)

The federal judge in Superior Oil Co. considered many

factors in determining that the deed and quiet title action

with which he was faced constituted a royalty interest and

not a mineral interest.  He did not say in that opinion that

-14-

the ambiguity in a statute constituted an ambiguity in a contract between the parties. He gave critical emphasis to the absence of the language "in, under or upon" in the Superior Oil Co. deed and quiet title action reservation. He said:

> "Many factors may be considered in determining whether a mineral or royalty reservation is intended. Of primary importance is the use of the term 'in, under or upon' as indicating a mineral interest and 'produced and saved' as indicating a royalty interest. The Montana court is consistent with a majority of the jurisdictions in holding that these phrases are the most significant guides to the parties' intentions . . ." 307 F.Supp. at 90. (Emphasis added.)

The critical term "in, under or upon" is contained in the reservation of minerals in the 1933 contract for deed between Musselshell County and Shields and in the quiet title action in 1943, determining the effect of that contract. There can be no ambiguity as to what was reserved. It was purely and simply a mineral interest.

The deductive process upon which the majority opinion depends therefore is that the contract between the County and Shields was not ambiguous; a statute was ambiguous; therefore, the County-Shields contract was ambiguous. By the same kind of deductive reasoning, we can prove that any cat has ten tails: No cat has nine tails; any cat has one more tail than no cat; therefore any cat has ten tails.

It is significant to me and I think the majority has not considered that in 1933 when the Musselshell County-Shields contract was executed, there was no statute authorizing or not authorizing counties to reserve minerals or royalties in transfers of unredeemed tax title lands. The first such authorization for counties came with the adoption in 1935 of Ch. 154, Laws of 1935. Section 2 of that Act became section

-15-

4481.2, R.C.M. 1947, which Superior Oil Co. found to be

ambiguous. The whole of that Act refers to mineral reservations,

and in no place mentions royalties. Of particular significance,

however, to this case are the provisions of section 4 of the

1935 Act which provided:

> "Section 4. All mineral reservations heretofore
> made by counties in this state, whether the same
> are of a greater percentage than is herein fixed,
> or not, and all agreements in connection with
> such reservations, heretofore made, whether in
> conformity with this act or not, are hereby ratified
> confirmed and validated." Section 4, Ch. 154, Laws
> of 1935. (Emphasis added.)

The 1933 executory agreement for an unambiguous mineral

reservation between Musselshell County and Shields was

validated by the Montana legislature in 1935 or my cat has

ten tails. Again, this validation statute was not before

the federal court in Superior Oil Co., supra, because the

deed in that case was executed in 1940.

The 1935 validation statute brings us to the res judicata

issue and the quiet title decree, which the majority dismisses

as "not particularly significant." On the contrary, the

quiet title decree is of decisive significance. It determined

in a judgment which became final that the interest of Musselshell

County was a 2 1/2 percent mineral reservation and it directed

the County when the purchase price had been paid, to deliver

a deed to Shields with such a mineral reservation in it.

The County has unexplainedly failed to carry out the direction

of the District Court when it issued the deed in this case,

possibly because in 1944, Roland V. Colgrove was the Musselshell

county attorney and not A. G. McNaught, who was the county

attorney at the time of the quiet title action.

The effect of the quiet title decree can not be avoided

on the ground that whether the County reserved a royalty

interest instead of a mineral interest was not litigated, because there could be no such issue. The language of the contract was unambiguously a mineral reservation; the contract had been given legislative blessing through a validation statute. Any attempt by the Musselshell county attorney in 1943 to raise an issue as to whether the 1933 contract stated a royalty reservation rather than a mineral reservation would have been frivolous. It is plain that such an issue could not have been litigated because no such issue existed.

The 1943 quiet title decree is therefore res judicata as to the purport and meaning of the mineral reservation, and as to the duty of the County to deliver a deed with a mineral reservation. If that be not true, there is no such rule of law as res judicata.

Where does all this leave the majority, whose opinion is premised upon the supposition that the 1933 contract between the County and Shields attempted to follow a code section before its enactment and that Ch. 171, Laws of 1941 (which has no application to the Shields contract) affords a "reasonable explanation" for the change to a royalty reservation in the Shields deed from the mineral reservation provided in the contract? They are in the position of an oil driller pumping a hole drilled in granite--there is no oil there.

Clearly and convincingly, this record establishes that Musselshell County and Shields contracted for a mineral reservation, and that the District Court decreed a mineral reservation be delivered to Shields. When the deed was delivered to Shields in 1944, it contained a royalty reservation. On the agreed statement of facts before us, there is nothing that gives any clue that the parties changed their intention, contracted otherwise, or knew that the deed did not reflect

-17-

their intention expressed in the contract and the quiet title decree. Any statement that they did change their intention, or their contract, would be sheer speculation on our part since we have only the agreed statement of facts to go on. It is only if merger by deed applies that there could be any justification for holding in favor of the County on the royalty reservation. The majority opinion glides by merger by deed, as though it rigidly applies here. This is not my view of the law.

Merger by deed, denominated a doctrine by some, is a broad statement that the grantor in a deed has completed the contract for deed even though he may not have fully performed. By finding a merger in the deed of all prior agreements between the parties, written or unwritten, courts have exonerated grantors from all legal responsibility for unperformed promises in the contract for sale. Through merger, in its purest form, the grantee in a breached contract, by accepting the deed, loses all right of rescission or cancellation or suit for damages occasioned by the breach. This is the result apparently accepted by the majority in reversing the District Court.

Merger by deed, as a legal concept, is so drastic that exceptions to it have grown up which are as old as the concept itself. Merger does not apply to agreements collateral to or independent of the contract for sale. Bull v. Willard (N.Y. 1850), 9 Barb. 641, 645. It does not apply where the omission in the deed is the result of mistake, accident or fraud. See, Union Producing Co. v. Sanborn (E.D. Texas 1961), 194 F.Supp. 121, 126; Stevens v. Vail Associate, Inc. (1970), 28 Colo.App. 344, 472 P.2d 729.

Professor Allison Dunham insists, in Merger By Deed, 10 Ga.L.Rev. 419, 420, 421 (Winter 1976), that the "doctrine"

-18-

appears in the Restatement of Law of Contracts, § 413 (1935),
through the pervasive influence of Professor Williston; but
that Professor Corbin suggests that there never was such a
"doctrine" (Dunham, citing 3A Corbin, Contracts, §§ 586,
587, 604.)   Professor Dunham also points to the provisions
of the Uniform Land Transactions Act (UTLA 1975), which
repeal the doctrine of merger by deed ((UTLA) has not
been adopted in Montana), and to the provisions of the
Uniform Commercial Code (UCC) which expressly rule out
merger in contracts to sell goods.  Section 30-2-607(2), MCA:

> ". . . acceptance does not of itself impair
> any other remedy provided by this chapter for
> nonconformity."

Bull, supra, the 1850 case, attempts to establish
merger by deed as to promises concerning "title, possession,
quantity, and emblements," holding these areas to be foreclosed
by the grantee's acceptance of the deed.  Again, Professor
Dunham, op cit., supra, at 443, notes the many exceptions.
See also, Comment, Merger of Land Contract in Deed, 25
Albany L.Rev. 122 (1924).

Montana has not heretofore expressly adopted merger by
deed, though it has been noted in dictum.  See, Schillinger
v. Huber (1957), 133 Mont. 80, 87, 320 P.2d 346, 348, (discovery
of error and acquiescence preventing reformation of a deed);
Sullivan v. Marsh (1950), 124 Mont. 415, 425, 225 P.2d 868,
872, (reformation denied, mutual mistake not supported in
absence of a prior contrary agreement); Voyta v. Clonts
(1958), 134 Mont. 156, 328 P.2d 655 (reformation denied,
where evidence failed to show the instrument did not reflect
the actual agreement of the parties).  If merger by deed
does apply in Montana, it is not as broad and as absolute as
some abbreviated statements make it out to be.  Its statutory
embodiment seems to be section 28-2-905, MCA, which provides

that "when the terms of an agreement have been reduced to writing, it is to be considered as containing all of those terms, . ." Yet the same statute sets forth exceptions, including "mistake or imperfection of the writing put in issue by the pleadings." See, section 28-2-905(1)(a), MCA. Land contracts enjoy no special statutory exception and are to be interpreted as any other contract so as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. Section 28-3-301, MCA.

Even if merger by deed applies, therefore, the court should search for the intention of the parties in determining rights under a deed. The burden of the parties seeking to set aside plain and unambiguous terms in the deed as contra to the actual intention of the parties is by clear, convincing and satisfactory proof. Sullivan v. Marsh, supra; Voyta v. Clonts, supra. Once that burden is met, the duty of the court is to enforce the true contract and not to make a new contract nor to perpetuate or make final a contract only partially or imperfectly performed. In so doing, the court would merely be reenforcing the reasons for the many exceptions to the concept of merger by deed.

In determining the true intention of the parties, the Court must place itself as nearly as possible in the position of the contracting parties, and their intent will be ascertained in the same manner as with any other contract. See, Szabo v. Superior Court (1978), 84 Cal.App.3d 839, 148 Cal.Rptr. 837; section 28-3-301, MCA. If we are going to adopt the rule of merger by deed in Montana, we should at least restate the rule to say that the concept will control except where the intentions of the parties are otherwise or where the

stipulations of the contracts sought to be enforced are collateral to the functions performed by the deed. Carsek Corp. v. Stephen Schxifter, Inc. (1968), 431 Pa. 550, 246 A.2d 365.

The intention of the parties here should be determined from the instruments presented in the agreed statement of facts. The District Court had before it, as we do now, (in equity cases, we review all questions of fact arising upon the evidence presented in the record, section 3-2-204(5), MCA), a contract for deed providing for a mineral reservation, and a deed providing for a royalty interest. If these two instruments were all we had, we might consider the evidence evenly balanced. The overbalancing factor, however, is the quiet title decree which not only determined that the parties had contracted for a mineral reservation, but ordered the County to deliver a deed with the mineral reservation in it. The quiet title decree is a determination by an outside agency with full authority to act that the true intention of the parties to the 1933 contract for deed was for a mineral interest reservation. The language of the contract for deed and the determination of the rights of the parties in the quiet title action, taken together, are clear, convincing and satisfactory proof that the executed deed does not speak the true intention of the parties. Moreover, to hold that the executed deed controls, we would have to assume something that does not appear in the agreed statement of facts: that sometime between the date of the quiet title decree and the execution of the deed, the intention of the parties changed and the new agreement was made. Absent direct evidence, it is as easy to assume that the executed deed is the result of accident or of a scriveners mistake as it is to assume that

the intention of the parties had changed. It is merely a resort to speculation.

The defendants contend that since the deed was executed and delivered after the quiet title decree that the deed is not subject to the res judicata application of the quiet title decree, citing Brannon v. Lewis and Clark County (1963), 143 Mont. 200, 387 P.2d 706. In Brannon, the plaintiff brought a quiet title action to certain lands in Lewis and Clark County and obtained a quiet title decree in 1950. Unknown to the plaintiff and the County, the lands to which the title was quieted were occupied in part by a highway which passed diagonally through the lots in issue. The plaintiff discovered the problem when she sought to sell the real property in 1960 and was advised that the real property had no real value because of the location of the paved highway. She commenced action in 1961 against Lewis and Clark County for trespass for the maintenance of a highway across her land. Summary judgment was granted against her, adjudging that the County had obtained a prescriptive right to the land as a highway and easement following the quiet title decree. This Court upheld the summary judgment.

Under the ruling in Brannon, it might be possible here to assume that following the quiet title decree new circumstances arose, or new agreements were made, which led to the execution of the deed providing the royalty interest to the County. There is evidence of prescriptive rights accruing after the quiet title decree in Brannon. Under that possibility, however, defendants run against the same barrier of proof that faces them in connection with merger by deed. Unless we guess, speculate or assume that some such change did occur, we have no evidence under the agreed statement of

-22-

facts which can justify any ruling except that the order quieting title, issued by the District Court, remains in full force and effect.

That the County allowed a default judgment against it in the quiet title action is not a sufficient legal excuse later to avoid the conclusive effect of the default judgment. Friedrichsen v. Cobb (1929), 84 Mont. 238, 275 P. 267.

I come now to the agreement of February 28, 1977, executed some 34 years after the deed from the County to Shields, and entered into between Musselshell County and the present landowners of the deeded lands. McSweyn is not a party to the agreement of February 28, 1977, which was executed 5 months after McSweyn acquired the oil and gas leases from Musselshell County, and 25 days after McSweyn filed this lawsuit for a declaration as to the validity of his leases. The agreement of February 28, 1977 should have no effect therefore as to McSweyn.

The majority opinion places great store upon the February 28, 1977 agreement, contending that by the agreement, the "[c]ounty and all other parties in 1977 agreed that the 1944 deed reserved a royalty." Of course they did. There is no dispute in the record or between these parties that the 1944 deed was a royalty reservation, and not a mineral reservation. What is important is that the agreement of February 28, 1977, between the County and the present landowners, was an arms-length agreement wherein the parties settled their conflicting differences as to whether the County was entitled to a mineral reservation or a royalty reservation under the Shields deed or other deeds held by the present landowners.

The pertinent parts of the February 28, 1977 agreement are these:

-23-

". . . WHEREAS, at one time the County acquired all of the above described real property for delinquent taxes and subsequently conveyed the Tract I property to one A. D. Shields and the Tract II property to John P. McCleary. Said transfers were made by virtue of contracts for deed to the purchasers set forth above.

"WHEREAS, when the County entered into contracts on the above described real property, certain reservations were made whereby the County made mineral reservations as set forth below. When the deeds were placed of record after complete performance by the purchasers under the contracts for deed, the County of Musselshell made royalty reservations in the deeds. The various royalty reservations are set forth below.

". . .

". . . WHEREAS, the parties hereto are in dis-agreement as to the interest of the County in the above described property. The parties hereto are desirous of settling such difference and settling the County's interest in the above described property; and the parties hereto mutually agree that where the deeds from the County to the various purchasers show that there was a 2 1/2 percent royalty, that said royalty interest be considered to be a 2 percent interest, and whenever the County reserved a 6 1/4 percent royalty in the above described property that said interest be considered to be a 4 percent royalty interest. Furthermore, the County makes no claim to any mineral interest in the above described property, and makes claim only to royalty interest as above set forth.

"NOW THEREFORE, for and in consideration of the sum of ten and no/100 ($10.00) dollars and other good and valuable consideration, and in full and complete settlement of the County's interest in and to the above described property, the parties hereto by these presents grant, bargain, sell, convey and confirm so much of their interest in and to the above described property that the County's sole and only interest is the following described royalty interest:

"[2 percent royalty interest in the lands concerned with the case at bar]

"This indenture is made for the purpose of conveying unto the County the . . . [royalty] free and clear of all costs of all oil, gas and hydrocarbons and other minerals produced and delivered in pipelines or otherwise produced and marketed from the above described premises, and this indenture is further made for the purpose of the County renouncing and

-24-

transferring to all of the other parties to
this instrument any and all other claim they
may have to any of the above described property
. . ."

It is clear from the terms of the agreement that instead of that agreement being a declaration of the parties as to what their intentions were in 1944, it is instead an arms-length agreement settling conflicting claims between the parties, but without the presence or assent of McSweyn.

The present landowners stand to gain, under the majority opinion of this case, by virtue of the agreement of February 28, 1977. Under the decision of the District Court, if we were to uphold it, the royalties under the McSweyn leases would be divided as follows:

Percentage distribution of oil
Assuming 2.5% County Mineral Reservation

| | |
|---|---|
| Lessee-producers | 85.00% |
| Landowners | 12.5 |
| McSweyn | 2.125 |
| County | 0.375 |
| | 100.000% |

Under the majority opinion, the distribution of oil proceeds will be as follows:

Percentage of distribution of oil
Assuming 2.5% Royalty Reservation and the Agreement of 2/28/77

| | |
|---|---|
| Lessee-producers | 85.00% |
| Landowners | 13.00 |
| McSweyn | 0 |
| County | 2.00 |
| | 100.00% |

The agreement of February 28, 1977, should have no bearing under considerations of equity or otherwise as to the disposition of this case.

I should have no difficulty, if the majority otherwise agreed with me, in showing that estoppel, laches and waiver constituted no bar to the validity of the McSweyn leases.

-25-

Because the majority do not reach those issues, I reserve a discussion, I trust to a future time. I would uphold the judgment of the District Court determining that the McSweyn oil and gas leases of Musselshell County were valid and subsisting.

_____
                    Justice